## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No.:  1:23-cv-00595-CNS-SKC

**TREVOR STUART,**

Plaintiff,

vs.

**PETZL AMERICA, INC.,**
**PETZL DISTRIBUTION, AND**
**BIG BANG CORPORATION**

Defendants.

---

### FIRST AMENDED COMPLAINT AND JURY DEMAND
---

COMES NOW Plaintiff, Trevor Stuart (hereinafter "Plaintiff" or "Stuart"), through legal counsel Joseph A. O'Keefe of M<sup>c</sup>Leod │Brunger PLLC, and hereby submits his First Amended Complaint and Jury Demand against Defendants, Petzl America, Inc., Big Bang Corporation, and Petzl Distribution (hereinafter "Petzl" or "Defendants"), and in support thereof, alleges as follows:

### INTRODUCTION

1.      This case arises from the defective design, manufacture, and failure to warn that the Petzl Shunt, an aluminum device intended, marketed, and sold by Petzl as a fall arrestor, can and does detach from a climbing safety rope while used for its intended and foreseeable purpose.

2.      Trevor Stuart used a Petzl Shunt as a fall arrestor when top rope solo climbing, a type of rock climbing wherein a climber self-belays, or self-lines, instead of having a partner belay.

3.      Plaintiff did so after performing significant research about what safety devices to use for top rope solo activities.

4.     Plaintiff found that top rope solo climbers regularly use fall arrestors like the Petzl Shunt in order to self-belay because the arrestor will clamp onto the rope when and if a climber falls from the rock face.

5.     This means that the fall arrestor must not separate from the rope under any circumstance, and certainly not under foreseeable and known circumstances. Separation from the rope means the climber falls from the sky and may experience death or serious bodily harm.

6.     Mr. Stuart used the Petzl Shunt for self-belaying as demonstrated by numerous online instructional videos from popular climbers and informational products produced by Petzl, which Petzl has actual knowledge of and benefits from.

7.     Unfortunately, Mr. Stuart's Petzl Shunt failed to arrest a fall and completely separated from the rope on November 30, 2021, when Mr. Stuart was climbing at Lower Meadow of the New River Gorge near the Kevin Ritchie Bridge on U.S. 19 in Fayette County, W.V.

8.     Because the Petzl Shunt failed to arrest the fall, Mr. Stuart hit the ground from a height of over sixty (60) feet, suffering serious bodily injuries, and may have died but for the heroic efforts of witnesses to his fall, first responders, and the medical professionals who treated him.

9.     The Petzl Shunt's failure to arrest his fall is the cause of his injuries.

## THE PARTIES

10.     Plaintiff is a citizen and resident of the State of Colorado who purchased the Petzl Shunt in issue in Denver, Colorado.  Prior to the events described herein, Trevor Stuart worked as a traveling registered nurse across the United States but remained a citizen of the State of Colorado. Trevor Stuart loves his job, not only because he was able to help those in need, but as a traveling

RN, his work took him to new places where he was able to both work and to pursue his climbing passion.

11.     Defendant, Big Bang Corp., represents that it is a limited liability company organized under the laws of France, with its principal place of business located at ZI Crolles, Cidex 105 A, 29820 Crolles, France. Big Bang is the owner of the Petzl trademark.

12.     Defendant, Petzl Distribution, represents that it is a limited liability company with its headquarters in ZI Crolles, Cidex 105 A, 29820 Crolles, France.

13.     Defendant, Petzl America, Inc., is a corporation organized under the laws of the State of Utah, with its principal place of business located at 2929 Decker Lake Dr., West Valley City, Utah. Petzl America's registered agent is Rashelle Perry who is co-located with Petzl America at its principal place of business in Utah at 2929 Decker Lake Dr., West Valley City, Utah.

14.     Petzl America, Inc. is the primary, in fact the sole, distribution company and agent within the United States, including Colorado, for all products designed, manufactured, marketed, and sold for closely related companies Petzl Distribution and Big Bang, which also own or control Petzl America.  Each of these entities maintain a common website at www.petzl.com and are owned and controlled as a "family business" by Paul Petzl as their president.[1]   Petzl America, Inc., is the agent within the United States for Petzl, Petzl Distribution, and Big Bang Corp. and is responsible for the marketing and sales functions of Petzl within the United States and Colorado,

---

[1] https://www.petzl.com/brand/s/Family-Ownership?language=en_US

including the marketing and sales functions that were directed at Plaintiff who purchased the Petzl Shunt in Colorado.

15.     "Petzl" also appears to have some, or all of the components for the Shunt built by Petzl Manufacturing Malaysia Sdn. Bhd., which represents that it is a Petzl manufacturing facility with its principal place of business located at Lot PT4047, Jalan Kancing Jaya 8, Taman Kancing Jaya, 48000 Rawang, Selangor, Malaysia.  Petzl Malaysia is owned and controlled by Petzl.

## JURISDICTION AND VENUE

16.     This case arises under the laws of the United States and the State of Colorado. Accordingly, the District Court has jurisdiction over claims arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. § 1331.

17.     This Court has jurisdiction to resolve any state law claims brought by the Plaintiff under 28 U.S.C. § 1367 and under Colorado law pursuant to C.R.S. § 13-1-124 because Petzl intentionally transacted business within the State of Colorado and committed the tortious acts described within Colorado, which caused the injuries described to Plaintiff, a Colorado resident.

18.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000 and because there is complete diversity of citizenship between the Plaintiff and Defendants, and because this action involves one or more residents outside of the United States.

19.     The Court has jurisdiction to enjoin actions which violate the Lanham Act and award damages and injunctive relief in accordance with that statute.

20.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391 because the defective product was intentionally marketed and sold to Plaintiff in Colorado within interstate

commerce. Plaintiff sustained injuries caused by Defendants' conduct which was intentionally directed at Colorado and around the world. A substantial part of the events or omissions giving rise to the claims occurred in Colorado.

## GENERAL ALLEGATIONS

21.     Petzl is one of the largest manufacturers, suppliers, promotors, and advertisers of recreational and professional climbing gear in the United States and across the globe.

22.     From Boulder to Ouray, to Summit County, Colorado has a large number of climbers, an extensive and large climbing market, and is one of Petzl's largest markets in the United States and around the world.

23.     As of 2018, approximately 5 million people in the U.S. participate in outdoor or indoor climbing[2].  As recently as 2017, The American Alpine Club estimates that climbing contributed $12.45 billion to the economy,[3] and was expected to grow.

24.     Climbing is big business in Colorado for Petzl.  Petzl knows this and profits from it as one of the most well recognized and trusted manufacturers of mountaineering equipment who directly, intentionally, and continuously directs marketing, sales, and its products in interstate commerce at climbers in Colorado.

25.     The Petzl website indicates at least thirteen (13) Petzl "dealers" on its website in Colorado, including Petzl's own "Expert" retailers, providing location and contact information for each.

---

[2] https://smallbusiness.chron.com/rock-climbing-industry-analysis-80142.html
[3] https://sgbonline.com/study-reveals-climbings-powerful-impact/

26.     Plaintiff purchased the Petzl Shunt, a/k/a Petzl Shunt Ascender, from one of Petzl's Experts in August 2020, which was delivered to him in Denver, Colorado.

27.     Defendant knew its Shunt was an inherently defective product that can completely fail to perform its intended function, as Petzl itself describes in its marketing materials and notices as "personal protective equipment used for fall protection,", a/k/a fall arresting, in common climbing situations, regardless of whether it is used for self-belaying, rope soloing, or top rope soling.

28.     One Petzl Expert publishes on its own website, linked to the Petzl Shunt, a 5-star review with text that states[4]: "I've also used it to rope solo or take photographs…"

29.     The same Petzl Expert recently advertised in another review of the Petzl Shunt, a/k/a ascender, that it can be used for "top rope soloing."

30.     In yet another 5-star review of the Petzl Shunt, the Petzl Expert advertised in a review that states: "Dont (sic) be fooled by reviews from those who don't (sic) know what they're doing; this is a great device for top rope soloing".  This review, and others, were apparently deleted by Petzl's Expert since the related Faulhaber case was filed in 2022.

31.     There is no doubt that Petzl knows, or at least should know, that its Shunt is being used for top rope soloing and self-belay.  In fact, the Shunt is being used almost exclusively for top rope soloing, self-belay, based upon Plaintiff's experience and observation in the market for sport climbing fall arrestors.

---

[4] https://www.rei.com/product/132997/petzl-shunt-ascender

32.     Petzl also advertises that: "**We have a deep responsibility to the people who trust us with their lives**, and **we develop, test, and qualify** all of our products above required standards. Our design center, based in France, integrates all crafts that are related to the creation of products: mechanical, textile, electronic, optical, and technological. From the design and prototype phases, the reliability of a product and the safety of the user are continuously evaluated, with particular attention to risks of use" (emphasis in original)[5].

33.     In spite of this, the Petzl Shunt is prone to at least four (4) fatal defects that make it wholly inappropriate for any use as PPE used for fall protection as a fall arrestor, but it is especially dangerous when put to its most common and current use as a fall arrestor for self-belay or top rope solo climbing.

34.     Petzl knows of these fatal defects and – for at least twenty years – has intentionally misled the public about the Shunt's performance as PPE for fall protection.  Thousands of climbers all over the world, Plaintiff and Craig Faulhaber included, have been relying on a device with fundamental and fatal problems that render it unfit for its purpose as PPE for fall protection and safety.

35.     Paramount to any PPE product, such as the Petzl Shunt, which is intended and used foreseeably as a safety device to prevent a climber from hitting the ground after a normal fall, the climber's rope should never, ever, detach from the device.

36.     The Petzl Shunt is unsuitable for its designed, known, and foreseeable use, top rope soloing (a/k/a self-lining, top roping, and self-belay), because the rope can detach from the Shunt

---

[5] https://www.petzl.com/brand/s/Industrial-Excellence?language=en_US

during a normal fall by a climber, such as the one sustained by Trevor Stuart, causing death or serious bodily injury.  The Shunt is defectively designed for its foreseeable and known uses, including, but not limited to, top rope solo climbing.

37.    Petzl failed to reasonably warn Plaintiff and other climbers within Colorado, within the United States, and around the world, that a climber's rope could detach from the Petzl Shunt during a normal fall causing death or serious bodily injury to the user of the Shunt under routine forces.

38.    Petzl also failed to reasonably warn that the Shunt could fail and detach from a climber's rope upon impact with a well-known backup, such as a stopper knot, under routine forces.

## THE PETZL SHUNT

## A GLOBAL BEST-SELLER UNSAFE FOR ANY USE

39.    As early as 1982, Petzl manufactured jammer-type Shunts widely used by the sport climbing community for self-belaying, specifically for the highly dangerous activity of spelunking. *See*, **Cave Science**, Vol. 9, No. 4, Dec. 1982.[6]

40.    REI's earliest advertisements for the Petzl Shunt, in fact, touted it as:

**The Petzl Shunt multi-purpose device is designed for ascending as well as a backup brake for rappelling, occasional self-belays, or top rope belays.**

**Features**
- Will lock on single or identical double kernmantle ropes but not on braided ropes; fits single ropes from 10 - 11 mm and double ropes from 8 - 11 mm
- Loads onto a rope without having to unclip; can be used as a back-up on descent or rappel when placed below the descender

---

[6] Through Google searching this is the earliest reference that Plaintiff can find where this device is used for self-belaying.

- A mechanical version of a Prusik hitch or Machard knot, the Shunt body must be held during usage on descent
- Applies friction (braking) when device is released

**Technical Specs**

| Best Use | Climbing |
|---|---|
| Fits Rope Sizes | 8 - 11 millimeters |
| Weight | 188 grams |

https://www.rei.com/product/471161/petzl-shunt-ascender (emphasis in original).

41.     Not only is the Petzl Shunt popular in the sport climbing community for self-belaying, it was once also widely adopted for use in industrial applications by workers needing to access areas by rope (like radio towers, silos, dam faces, and drilling rigs) and by mountain rescue teams – both instances where self-belay is common.[7]

42.     In fact, beginning in 1999, Petzl itself provided specific information for use of their Shunt as a back-up for industrial rope access if the primary line failed.

43.     The Petzl Shunt was widely used within the industrial rope access community for primary fall arresting and quickly became an industry standard.

44.     Then – at the height of its popularity – a series of serious accidents involving the Petzl Shunt led to further testing of the device in the industrial rope access community.

45.     These tests exposed that the Shunt had fatal flaws and should have resulted in its withdrawal from the market as a fall arrestor *for all markets*.

46.     In 2001, Lyon Equipment Ltd., a British company that provides training, products, and services for the rope access community, was commissioned by the Health and Safety Executive (roughly the British equivalent to Occupational Safety and Health Administration

---

[7]Petzl pays for product placement in media where climbing rescue is depicted dramatically. *See, e.g.,* Fire Country – CBS, November 18, 2022, episode.

("OSHA")) to investigate items used as personal protective equipment for industrial rope access.

*See Ex. 1 Industrial rope access - Investigation into items of personal protective equipment*, Health and Safety Executive, Contract Research Report 364/2001.

47.     In this report, Lyon found that "the Petzl Shunt ha[d] become almost universally accepted as the industry standard and was stated as meriting particular attention [for investigation]."

48.     The report investigated many similar devices, like the Komet Stick Run, Petzl Microcender and Rescucender, and Tractel Stopfor D, which are all cam loaded rope clamps like the Petzl Shunt.

49.     But the Petzl Shunt is different from those devices in a crucial way.

50.     All the other devices tested operated with a pivoting cam that traps the rope against the body of the device:

*In all but the Petzl Shunt, the pivot lies between the applied force and the cam. ... [i]n the Petzl Shunt the cam lies between the pivot and the applied force.*

51.     The 2001 report concluded that:

*... the shortfalls of the Petzl Shunt have been clearly seen and the industry should now be developing [alternative] devices . . . .*

52.     These shortfalls noted in the 2001 Lyon Report are:

(1) a grabbing reflex causes people to grab the device when they fall and grabbing the device leads to total failure because the cam is disengaged,

(2) that the device can get tangled in the user's equipment which could interfere with the cam's operation which leads to total failure,

(3) the device's relatively weak body strength could lead to total failure where the device releases from the rope at forces as low as four kilonewtons [4 kN], and this problem is exacerbated when only one rope is used, as is typical in rope access situation, and

*(*4) the device requires low force to slip and in a dynamic loading situation (as is typically in sport climbing) the devices could slip well in excess of two meters.

53. Notable is the interplay between shortfalls three and four.

54. It is well known that force equals mass times acceleration (F=MA); thus, when a climber with a mass (M) falls any distance and accelerates toward the earth as a result of gravity (A), there is more force (F) being applied to the device's body and the rope.

55. Unknown to Plaintiff, during testing, the Petzl Shunt bent and released the rope at 5.5 kilonewtons (kN) of force.

56. Lyon described it as

... *a little too low for comfort, giving a very small margin of safety.*

57. In fact, the device failed every minimum working strength test conducted by Lyon, every single one.

58. In conclusion, the report concludes:

*[t]hese problems are largely the result of the adoption of a device that was not specifically designed for the purpose [of a back-up device].*

59. It logically follows that if this device is not suitable as a back-up fall arresting device, then it is also not suitable as a primary fall arresting device either.

60. The Petzl Shunt is too weak to be a reliable fall arrester in *any* situation given that failure means almost certain severe bodily injury or death.

61. Nevertheless, in 2004, a point where it should have been obvious, if Petzl had made reasonable warnings, that no one should be using the Petzl Shunt, the Bureau of Reclamation noted that the Petzl Shunt was:

... *the most common rope access back-up device in use world-wide.*

62.     Throughout the 2000s, scrutiny on the device increased as the incidents involving the Shunt piled up.

63.     In response, in 2009, Petzl finally gave specific guidance that only those who have received and mastered International Industrial Rope Access Trade Association ("IRATA") training should use it as a back-up device.

64.     Yes, after eight to nine years of failure after failure, Petzl responded by telling the rope access community to restrict its use to a back-up for master technicians.

65.     This guidance was not a ringing endorsement of the Shunt's safety or use by amateurs, nor did Petzl tell the climbing community that a climber's safety rope could detach from the Petzl Shunt during a fall.

66.     Despite this guidance to the rope access community, Petzl made no amendment to their guidance to sport climbers at that time.

67.     Despite this guidance, issues with the Shunt continued to occur in the rope access community.

68.     In 2011, IRATA, a trade group consisting of companies and technicians whose lives and livelihoods depend on safe rope access, conducted tests of the Petzl Shunt's performance in arresting falls.

69.     The results of this testing were disturbing.

70.     Twenty-five percent of the IRATA Experts who attempted to arrest their fall with a Petzl Shunt failed to do so using the IRATA technique of shunt + small line + knot.  Petzl did not tell the recreational rope climbing community this either, in fact, they concealed it with an

ambiguous warning about the cam becoming jammed in overhang situations, which is the opposite of the rope detaching from the device.

71.     This means, under ideal conditions with an expert in rope access techniques attached to the rope (these experts did not grasp the Shunt and did not invert the Shunt, for example), a climber may have a one in four chance that the Shunt fails to perform.

72.     This is akin to selling an airplane that has a one in four chance of crashing if it encounters normal levels of turbulence.

73.     In response to these tests, Petzl then told IRATA that:

*"Petzl cannot continue to support IRATA's use of the Petzl Shunt as a principle back-up device used in this manner . . . ."*

74.     In 2012, Petzl came out with more specific guidance on the Shunt specifically not recommending its use as a back-up *in industrial* rope access.

75.     However, this guidance only mentions one of the shortfalls that was known for at least a decade, the risk of failure due to grabbing the device.

76.     This guidance does not specifically address the risk of failure arising from equipment interference and the device bending when exposed to forces above 4 kN.

77.     This guidance does not even mention the sport community and, in fact, was indicated by Petzl specifically *NOT* to apply to the Shunt's sport uses.

78.     Petzl simply re-directed its defective product to the sport climbing community without warning, which it contends is *inherently dangerous*, as if to somehow excuse the complete failure of the device intended as PPE for fall prevention.

79.     Yet, despite all the evidence showing this is a dangerous product, in 2012, Petzl still specifically indicated the use of the Shunt for self-belaying for sport climbers and as a back-up for traditional two-person belay climbing in their technical manuals thereby concealing the hazard to the sport climbing community.

80.     Eventually, Petzl dropped the instructions for self-belaying from their technical manuals for the Shunt and appears to have removed the Shunt from pro catalogs.

81.     Notably, nowhere in these updated technical manuals, or any of the guidance ever promulgated by Petzl, does it say specifically to never use the device for self-belaying because of the four documented shortfalls described above.

82.     This warning does not describe all the shortfalls identified by the rope access community that make the Shunt unsuitable for any use, nor does it even depict a fall that results in the Shunt becoming inverted like Camus illustrates in his You Tube Video, the so-called Scorpion Catch.

83.     This guidance describes "two limitations" on use when self-lining, neither even hinting as the entanglement problem, the body strength problem, or the slip distance problem.

84.     This is because if climbers were fully aware of these problems, they would not buy it for any purpose. A fall arrestor that fails when encountering normal forces is not reliable enough for any practical use as a fall arrestor or as PPE.

85.     Petzl now markets the Shunt purely as a sport device and only for backing up traditional two-person belaying.

86.     REI currently markets this product as the "new" Petzl Shunt, however, other than changing the diameter of rope accepted, the product appears to be identical to that which is outlined above.

87.     Today, the Petzl Shunt is now advertised as follows:

**Used below the rappel device, the Petzl Shunt works as a rappel backup and replaces self-jamming knots like the Prusik. It works on both single and double ropes.**

**Features**
- Easy to install on the rope
- Smooth clamping surfaces won't damage rope
- May be used to ascend single or doubled ropes

**Technical Specs**

| | |
|---|---|
| **Best Use** | Climbing |
| **Fits Rope Sizes** | Single ropes: 10-11 millimeters; double ropes: 8-11 millimeters |
| **Body Material** | Unavailable |
| **Cam Material** | Unavailable |
| **Weight** | 188 grams |

88.     This is consistent with Petzl's continued marketing and sale of its Shunt to the sport climbing community while saying it is too dangerous for a community of professionals who are experts in using these devices, the rope access community.

89.     Moreover, Petzl, while ostensibly recommending that none of its products are for use while solo climbing, plainly notes in its materials:

<u>General principles for solo climbing with a fixed belay rope.</u>

*Petzl has not developed a device for this activity, but certain ascenders may be used for it by experts.*

15

90.     While the current version of their device recommendations for solo-belaying on their website specifically says, "This device [the Shunt] is not suitable for self-belaying," but does not have the explicit warning that the rope can detach from the device.

91.     However, the package and materials within the package, *i.e.,* the Box, do not appear to contain any warnings at all about rope solo activities.

92.     For example, the package materials merely state, albeit buried in small print much smaller than here:

"WARNING

**Activities involving the use of this
equipment are inherently dangerous.
You are responsible for your own actions, decisions and safety.**"

93.     The current version of the materials that come with the Shunt do not; (1) mandate for self-belay the use two of Shunts, (2) describe the danger regarding the Shunt arising from reasonably foreseeable use and exposure to forces above four kilonewtons, and (3) prohibit the use of the device for rope soloing.

94.     Petzl's current on-line statement is that the Shunt is not recommended for self-belaying only because:

The probability of experiencing these malfunctions is very low, but not negligible, and it only takes once…

Greater danger on sloping terrain where pressure against the device can impede locking. The device will not lock if the user grabs the device during a fall. This device is not suitable for self-belaying.[8]

---

[8]     https://www.petzl.com/US/en/Sport/Appendix-1--Petzl-does-not-recommend-using-only-one-ascender-for-self-belaying-?ActivityName=Rock-climbing

95.     Again, no mention of the other shortfalls in this on-line warning.

96.     There is no mention of the 25% failure rate in the IRATA test, either on-line or on/in the Box.

97.     There is no mention that it is so unreliable that it should not be used by rope access professionals, even as a backup, either on-line or on/in the Box.

98.     There is no mention that the rope can detach from the device causing death or serious bodily injury, as opposed to jamming, which is a mere inconvenience, either on-line or on/in the Box.

99.     Further, evidencing the reasonable need for a prominent warning on the exterior of the Shunt's packaging materials, i.e., the Box – *expressly and unambiguously warning against self-belaying, top roping, or self-lining because the Petzl Shunt can easily detach from the climber's rope and cause death or serious bodily harm* – at least one retailer, who offers Petzl products, including the Petzl Shunt for sale within the United States in Colorado, advertised the following warning from Petzl, which specifically permits self-belay as of the date of the related Faulhaber case, which Petzl knows or should know (emphasis added in notice):

### Important notice : Specific training is essential before use

Read this notice carefully before use. This technical notice illustrates ways of using this product. Only some types of misuse and forbidden uses currently known are represented (shown in the crossed out diagrams). Many other types of misuse exist, and it is impossible to enumerate, or even imagine all of them. Only the techniques shown in the diagrams and not crossed out are authorised. All other uses are excluded : danger of death. In case of doubt or problem of understanding, contact PETZL.



100.    In other words, even after the Faulhaber and the Stuart falls in September and then November 2021, and even after the Camus video about how the Shunt can "kill you" published in December 2021, Petzl continues to fail to prevent its retailers from using dated "important notice" materials with the marketing of the Shunt.   This further illustrates Petzl's failure to include reasonable warnings on the Box and in the packaging materials.

101.    Today, Petzl pretends that it tells customers on-line not to use the Shunt for rope soloing.  This is with a wink and a nod.

102.    Petzl also knows that this is its only practical use, PPE for fall prevention, they profit from it.  Petzl also knows that nearly every online review of the device is for use in top rope solo climbing and climbing influencers (some of whom are likely sponsored by Petzl) have posted guides and videos on how to use the Shunt for top rope solo climbing, which Petzl has actual knowledge of, and continues to profit from.

18

103.     Petzl also sponsors climbers who author stories and create videos about successfully using the Petzl Shunt for top rope soloing and self-belay.

104.     One Petzl-sponsored climber and author, Andy Kirkpatrick, expressly recommends the Petzl Shunt as one of the best two devices for top rope soloing, advertising and marketing that the Shunt is the most popular self-lining device (even though it is not recommended for self-lining), has been used for decades for this purpose, has been recommended by Petzl for this express use in the past, has been demonstrated to work, and stating that <u>it can't be removed from a rope</u>.[9] Petzl knows, or should know this, that it is false, and to this day does not expressly and unambiguously warn climbers not to use the Shunt for rope soloing *because* it can detach from the rope causing death or serious bodily injury.

105.     Today, Petzl continues to remain essentially silent while Andy Kirkpatrick recently posted a video following Faulhaber's September 19, 2021, fall (and the subsequent fall by Plaintiff in West Virginia on November 30, 2021) by another rope solo expert titled: "How the Petzl Shunt Can Kill You," by Yann Camus of BlissClimbing.com, which received more than 39,000 views since it was first published on December 6, 2021.

106.     In Camus's video created after the Faulhaber and Stuart incidents – and because of them – the social media influencer and expert climber acknowledges that he has discovered at least one way that the climber's rope can "easily" detach from the Shunt, which Petzl knows or should know, and that the Shunt is "very dangerous." Camus's video, which explains how the climber's

---

[9]https://www.andy-kirkpatrick.com/blog/view/self-lining

rope     can     detach     from     the     device     can     be     publicly     viewed     at:

https://www.youtube.com/watch?v=Xh5UJNvrLWM

107.    Petzl is aware that its Shunt is almost exclusively used by its buyers as a fall arrestor for top rope solo climbing and profits from it.

108.    Even amateurs using the Shunt praise it for use in top rope soloing, likely because the true risks associated with the device have been concealed.

109.    Climbing forums to this day share how to use the Petzl Shunt for self-belay on a top rope using Petzl's own materials that provide self-belaying instructions.[10]

110.    Despite these facts – all of which illustrate the need for clear warnings on and within the packaging about these dangers to prevent its use for self-belaying – the Petzl Shunt's packaging materials still do not expressly and unambiguously warn against self-belaying, top roping, or self-lining because the Petzl Shunt can detach from the climber's rope under relatively light forces, using normal and foreseeable diameter climbing ropes, and cause death or serious bodily harm from the resulting fall.

111.    Petzl has known about the safety related defects of the Petzl Shunt and did nothing to recall, re-manufacture, fully remedy the design defects related to the Shunt's intended purpose, or reasonably warn foreseeable users about the hazards Petzl had actual knowledge of, specifically

---

[10]    https://www.mountainproject.com/forum/topic/106044879/modifying-your-gri-gri?page=2 ("One of my route-setting partners uses a Petzl Shunt to solo self-belay on a top rope. He attaches the Shunt to his harness with a locking carabiner and uses a weighted top rope. The system seems to work very well for him, even on hard, steep routes. There are some caveats about doing this in Petzl's instructions for use").

as it relates to a climber's rope detaching entirely from the Shunt resulting in death or serious bodily harm.

112.     For example, it is feasible that the Shunt could be re-designed and re-manufactured to be made from more durable materials which would prevent the Shunt from detaching from the rope.  Petzl likely has not done this because it is too expensive and because they put profit over people knowing that most of the climbers that fall under circumstances similar to Plaintiff and Faulhaber will not live to tell the story and thus conduct an investigation.

113.     It is likely that the only reason the safety issues associated with the Petzl Shunt's use have come to the light of day is because Faulhaber and Stuart lived to figure it out and tell their story.

**<u>PLAINTIFF'S RELIANCE ON THE PETZL SHUNT NEARLY KILLED HIM</u>**

114.      Plaintiff did what was reasonably foreseeable, and ultimately intended by Petzl, he used the Shunt as a fall arrestor.

115.     Trevor Stuart is an experienced rock climber and has been climbing for over ten (10) years.

116.     Plaintiff purchased the Petzl Shunt, a/k/a Petzl Shunt Ascender, with the intent to use it as a fall arrest system while top rope solo climbing.

117.     He did this after doing extensive research to find a suitable device to secure him to the rope while solo climbing.

118.     Petzl, through its experts, influencers, and marketing, has created the impression among climbers that it is a "great device for top rope soloing" and Mr. Stuart was acting upon that impression cultivated by Petzl and its retailers when he purchased and used the Shunt.

119.     Petzl knows that its Shunt is being used for top rope soloing and self-belay and does little to inform buyers that this reputation as a "great device for top rope soloing" is contradicted by experimental evidence and the learned experience of those who have fallen from the sky due to its failure, including the Colorado Plaintiff, Craig Faulhaber, in the related case, who fell and nearly died only a few months before Plaintiff.

120.     Over these years, Plaintiff's experience and observation demonstrates that the Shunt is almost exclusively for top rope soloing. He does not know of a single person that uses the Petzl Shunt as a rappel backup device, nor is it clear how the device could actually be used as a rappel back-up device.

121.     On November 30, 2021, Mr. Stuart was climbing in an area around the Meadow River in Fayette County, West Virginia. He was attempting to top rope solo on a formation called The Greatest Show on Earth at the Lower Meadow of the New River Gorge.

122.     As an experienced climber, Mr. Stuart was top rope solo climbing and relying upon the Shunt he purchased in Colorado to safely attach himself to the rope.

123.     While top rope soloing, a climber attaches a device to his or her rope intended to slide up with the climber as the climber ascends the rope and then the device grabs the rope if you fall.

124.     Mr. Stuart's Petzl Shunt completely failed when, instead of grabbing the rope to prevent his fall, it completely separated from the rope causing him to fall at least sixty (60) feet to the ground, and perhaps closer to the apex of the climb which is ninety (90) feet.  Plaintiff's fall should have killed him, and it is pure luck that it did not.

125.   This fall caused Mr. Stuart life threatening and altering injuries that required past and future medical care, including flight for life air transport.

126.   When Mr. Stuart fell, only after the Shunt failed to prevent him from sustaining serious bodily injuries, Mr. Stuart was using it for its reasonably foreseeable and known use, fall prevention while solo climbing.

127.   The Shunt failed to prevent Stuart's fall because the rope detached from the device during a routine fall through a designed and manufactured gap/slots in the device as seen below:



128.   During Plaintiff's fall, it is likely that his climber's rope snagged in the top of the Shunt, tilted sideways or inverted (i.e., a so-called "Scorpion Catch"), and the rope ripped through the intentionally manufactured gap/slot at the end of the red arrow above.  Most likely, the Shunt tilted sideways and then snagged during the fall, where a relatively light load is sufficient to compress the diameter reasonable and commonly used climbing ropes, such as Plaintiff's, and force it through the gap/slot depicted above.  Then, the climber falls to the ground foreseeably sustaining serious bodily injuries or death.

129.     Camus demonstrates this very clearly in his December 6, 2021, YouTube video, created in response to the Faulhaber and Stuart falls.  Petzl refuses to alter its warnings despite actual knowledge of both falls.

## THE PETZL SHUNT DESIGN CHANGE

130.     The Petzl Shunt's design has remained relatively consistent since it was patented in France in 1970.[11]

131.     Despite the relative stability of the platform, the Shunt has undergone nine (9) versions, called Models A through I.[12]

132.     The first seven (7) versions of the Shunt, from 1970 until relatively recently, had a two-part lever design, while the two recent versions have an altered lever design.

133.     The new lever design incorporates the "posts" of the lever into one piece rather than the posts being made of a separate rod running through the lever.

134.     In the comments to his Scorpion Catch video, Camus stated that the last two versions of the Shunt appear to have a higher likelihood of failure than the prior versions.

135.     These last two versions are the versions that have the new one-piece Shunt lever.

136.     Since 1970, the average product lifespan of a Petzl Shunt is six (6) years.

137.     In 2009, Petzl opened a manufacturing facility in Malaysia and began using the facility to manufacture its products.

---

[11] https://patentscope.wipo.int/search/en/detail.jsf?docId=FR188103174&_cid=P11-LFVMY8-30560-1

[12] http://www.verticalmuseum.com/VerticalDevicesPage/Ascender/T2LeverCamPages/T2LeverCam0099.php#anchorVersionH

138.    The Petzl manufacturing facility opened fourteen (14) years ago.

139.    It is common for design changes in a product to occur when a manufacturing line is being updated or changing, which is perhaps why the Petzl Shunt lever was redesigned for the most recent two (2) versions of the Shunt.

140.    It is likely that this redesign is a key reason that the probability of a Scorpion Catch failure is more likely to occur in the most recent two versions of the Shunt. Both Plaintiff and Craig Faulhaber purchased, and were using, the most recent model (Model I) of the Petzl Shunt.

**THE PETZL SHUNT IS INHERENTLY FLAWED**

141.    The entire time Mr. Stuart was climbing that day, he was using the Petzl Shunt in a manner reasonably foreseeable to Petzl using routine and foreseeably ancillary equipment.

142.    The device failure that injured Mr. Stuart was of the specific type denoted in the various studies and reports because it was likely that the Shunt subjected to forces in excess of 4kN (an amount of energy consistent with normal fall arresting given the Shunt's design and its usual use when employed for self-belaying) which may have deformed the body of the device, at least temporarily, compressed the rope, or in any event allowed the Shunt to separate from the rope, which should never happen in any reasonably designed fall prevention device.

143.    All you have to do is watch the Camus YouTube video created after Plaintiff's fall to see how this device can and does completely fail with relatively little force.

144.    Climbing expert Yann Camus, of BlissClimbing.com, uploaded a video where he demonstrates how the Shunt easily separates from a rope when positioned in a predictable manner where the device is inverted using foreseeable ancillary equipment.

145.    Mr.    Camus'    video    can    be    found    at:
https://www.youtube.com/watch?v=Xh5UJNvrLWM

146.    In spite of this publicly available, simple video demonstration by Camus, Petzl
continues to stick its proverbial head in the sand about all of this while falsely claiming "[t]here
are a wide range of factors which could be the cause of these reported falls…."

147.    Petzl also knows, or should know, that a popular social media and climbing-influ-
encer    and    professional    climber,    Dave    MacLeod,    published    a    YouTube    video    at
https://youtu.be/kd13IaWS8gQ?t=782 and on other platforms such as epictv.com and his own
blog, with approaching 300,000 views, that shows climbers how to top rope solo using the Petzl
Shunt which Petzl undoubtedly profits from, e.g., banner ads and pop-up advertisements.

148.    One review of MacLeod's article on the use of the Petzl Shunt while top roping
"was enough to make me want to immediateley (sic) order one[13]."   Petzl knows and profits from
this.

149.    Petzl also knows that its social media influencer, Dave MacLeod, continues to
publish social media materials on You Tube as recently as October 2022, showing climbers how
to use the Petzl Shunt in rope soloing activities, explaining why he uses it, even though with a
proverbial wink and a nod he says it should not be used for rope soloing.

150.    While Mr. MacLeod has now taken down the popular video described above with
300,000+ views, he has published "**How I self belay top rope with the Shunt**" which can be
publicly    viewed    at    https://www.youtube.com/watch?v=q4N2WGcABLo.    Mr.    MacLeod

---

[13] https://www.mountainproject.com/forum/topic/106638387/best-solo-tr-device

acknowledges that he knows that people have been having these types of accidents – *i.e.,* like Plaintiff's and Faulhaber's – for "years and years and years."  In spite of Mr. MacLeod's recent proclamation and admission in October 2022, Petzl continues to refuse to reasonably warn, or acknowledge, concealing that its product has apparently caused these types of incidents for "years and years and years".

151.    Petzl knows and profits from this so-called guerilla marketing and then intentional market confusion as well.

152.    Climbing forums also share how to use the Petzl Shunt for self-belay on a top rope using Petzl's own materials further illustrating the need for warnings on the packaging or a total recall/refund of the inherently defective product which was designed for self-belaying.[14]

### **THE AFTERMATH**

153.    Mr. Stuart, like other victims of the Shunt's failure, experienced dramatic, life-altering injuries that were singularly caused by the Shunt's failure.

154.    He suffered a laceration to his right arm and kidney, broken bones to the thoracic and cervical spine, a subdural hematoma., and five broken ribs.

155.    Emergency services were immediately called and firefighters and first responders from several departments in the area responded to the scene. Firefighters from the Wilderness Fire Department, Summersville Fire Department, and Keslers Cross Lanes Fire Department all arrived

---

[14]     https://www.mountainproject.com/forum/topic/106044879/modifying-your-gri-gri?page=2 ("One of my route-setting partners uses a Petzl Shunt to solo self-belay on a toprope. He attaches the Shunt to his harness with a locking carabiner and uses a weighted toprope. The system seems to work very well for him, even on hard, steep routes. There are some caveats about doing this in Petzl's instructions for use")

on the scene in addition to the Fayette County Technical Rope Rescue team who worked together and coordinated a complex rope rescue in order to move Trevor safely from the area where he fell to an area where he could be airlifted. [15]

156.    After the fall, Trevor Stuart was knocked unconscious and was in critical condition.

157.    To this day, he has no recollection of the fall.

158.    This was by any reasonable account a near death experience which causes on-going emotional pain, suffering, and mental anguish.

159.    After being evaluated and moved from the area by the coordinated effort of local fire fighters and first responders, Trevor Stuart was deemed to be in critical condition and required and immediate Air Evacuation.

160.    Once Plaintiff was as stable as possible, and securely moved to an area accessible by helicopter, he was then flown to the Charleston Area Medical Center in Charleston, West Virginia in critical, but stable condition. Trevor Stuart was extremely lucky so many individuals and first responders were able to come to his rescue.

161.    As a result of the fall, Plaintiff was severely injured and was required to stay in the Intensive Care Unit ("ICU") at Charleston Area Medical Center for six (6) days before he was forced to check himself out of the hospital because of his mounting medical bills. Plaintiff was then transferred to his parent's home in Indiana to continue his recovery with the assistance of family.

---

[15]    https://www.wdtv.com/2021/12/01/rock-climber-critical-condition-after-traumatic-fall-near-kevin-ritchie-bridge/

162.     Unable to return to his residence, work, or to take care of himself, Plaintiff was transferred to the care of his parents until he was able to take care of himself once again.

163.     Plaintiff is reasonably expected to have long road of treatment ahead of him and there is no certainty that he will ever fully recover from his injuries resulting together with the loss of enjoyment of life, past and future medical expenses, permanent impairment, scarring, mental and physical suffering, and loss of wages and earning potential.

164.     As a result of this life-threatening event, Plaintiff is also unfortunately at an increased risk of adverse psychological, emotional, and mental pain and suffering, which may include PTSD, anxiety, or depression.

165.     However, his injuries could have been easily prevented if Petzl stopped ignoring reality when it was overly apparent that the Shunt is not safe.

166.     The reality is that Petzl has growing knowledge of accidents involving complete rope separation. Accidents involving complete rope separation were reported to Petzl prior to Mr. Stuart's accident – including Craig Faulhaber's fall – and, instead of issuing a recall to get this inherently unsafe product off the market when it had knowledge of these accidents, they continue to sell it while demonstrating faux concern that the Shunt should not be pressed beyond its limits.

167.      The Petzl Shunt is inherently dangerous while it is used for its foreseeable, express, or implied purpose as a fall arrestor. Using the Shunt at all presses the Shunt beyond its limits and there is no adequate warning to the climbing community and public about this fact.

168.     Since Stuart's fall and injuries, Petzl released on social media, including Instagram and Facebook on December 20, 2021, that the fall resulted from the rope reportedly detaching from the Shunt.  Despite this, Petzl continues to fail to recall the device and continues to fail to

include on the exterior of the packaging a reasonable and prominent warning that a climber's rope can detach from the Shunt during self-belay or top rope soloing during a fall which can cause death or serious bodily injury.

169.     Prior to this social media post, Petzl has never warned consumers and climbers, such as Faulhaber, in any reasonable manner, that a climber's rope can detach from the device through a gap/slot in the Shunt during a normal fall causing death or serious bodily injury.  This is particularly important because the Shunt was at least once expressly approved for self-belay by Petzl, even though it opaquely warns against the practice without specific or reasonable reference to the climber's rope detaching and separating from the Shunt during a fall resulting in death or serious bodily injury, which is the foreseeable risk that Petzl knows about.

170.     For example, following the fall, on the Petzl website's FAQ's, one question asks: "Can I use the SHUNT to self belay?"  Petzl's answer is anything but reasonable under the circumstances – "No, the SHUNT is not authorized for self-belaying, for many reasons, including but not limited to, the risk of the cam jamming in an overhang situation."

171.     First, this is important because (i) a "jam" in an overhang situation, and (ii) a rope detaching and separating from the device are inapposite to each other in terms of risk to the climber, with the latter having the obvious potential to cause death or serious bodily harm while the former is generally a minor inconvenience to a climber.

172.     Second, this FAQ response unreasonably ignores the numerous videos and publications, some of which are endorsed and sponsored by Petzl, which describe how to use the Petzl Shunt for self-belay, top rope soling, and self-lining.

173.     Cynically reacting to a forum thread about Craig Faulhaber's experience in the related case with the Petzl Shunt and illustrating the inadequacies of Petzl's warning about the Shunt, a device designed and once approved expressly for top rope solo and self-belay, one Colorado climber posted on a public climbing forum on December 11, 2021, a truth revealing meme which shows not only the unreasonableness of Petzl's alleged warning, but also the outrageousness of Petzl's purported warning about the possibility of a cam jamming in an overhang:



174.     The December 20, 2021, social media post by Petzl finally acknowledged that the falls resulted from the rope detaching from the Shunt.

175.     This was the first public warning to consumers and climbers such as Mr. Stuart in any manner that a climber's rope can detach from the device through a gap/slot in the Shunt during a normal fall causing death or serious bodily injury, even though the packaging materials and the Petzl website continued to articulate the basis for the rope solo restriction was a cam jamming.

176.    Despite this acknowledgement that the unthinkable – complete separation of the rope can happen when using the Shunt – as of filing this First Amended Complaint, the Petzl Shunt is still for sale and its self-proclaimed retail experts and social media influencers still disseminate the falsehood that this device is safe for any use because Petzl refuses to adequately warn.

177.    Despite Petzl's knowledge and express or implied endorsement for use, there are no reasonable warnings of falling, rope detachment, death or serious bodily injury when using the Petzl Shunt while top rope soloing, self-belaying, or self-lining on the Petzl Shunt's box, or in the materials provided with the Shunt inside the box.

178.    It is unconscionable, in reckless disregard for the rights of Plaintiff, and a violation of their legal duties, that Petzl does not recall the Shunt or expressly and unambiguously warn against self-belaying, top roping, or self-lining because the Petzl Shunt can detach from the climber's rope during a routine fall and cause death or serious bodily harm.

**<u>FIRST CLAIM FOR RELIEF</u>**
**(False Representation)**

179.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

180.    For years, the Defendants represented to the public that the Petzl Shunt was safe for top-rope soloing.

181.    However, the Defendants knew for decades that the Shunt was, in fact, a deadly device insofar as the climber's rope could detach from the safety device.

182.    Beginning with the Lyons report in 2001, and perhaps earlier, the Defendants knew that the Petzl Shunt could not be safely used to top-rope solo, and it was even risky to use the Shunt as a back-up device.

183.    Later, in 2012, the Defendants took the affirmative step of recommending that industrial climbers refrain from using the Petzl Shunt, but they failed to provide the same guidance to recreational climbers.

184.    Instead, the Defendants induced sport climbers, such as Plaintiff, to continue purchasing the Shunt by touting its "safety" for top-rope soloing and as a back-up belay device, which representations are and were material.

185.    These comments, both directly from the Defendants or allowed by them through their proclaimed "Experts," professional climbers, and social media influencers, attracted customers for Defendants' own economic benefit.

186.    Plaintiff reasonably relied on such marketing materials.

187.    Plaintiff's reliance on these marketing materials is the cause of Plaintiff's injury because he would not have purchased or used the Shunt had he known that his climber's safety rope could detach from the Shunt during a routine and foreseeable fall.

188.    These customers, including Plaintiff, were unaware that they were purchasing a hazardous piece of equipment, and the resulting number of Shunt-related injuries is likely to continue to rise today.

## SECOND CLAIM FOR RELIEF
### (False Designation)

189.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

190.    This claim arises under laws of the United States, i.e., 15 U.S.C. § 1125, and Colorado, i.e., the Colorado Consumer Protection Act ("CCPA").

191.    The Petzl Shunt, and the packaging and literature that comes with the device, represents that the product is made in France.

192.    However, the Defendants opened a manufacturing facility in Malaysia in 2009 to produce Petzl products.

193.    At about the same time as the facility opened, Petzl completed a product redesign on the Shunt, modifying the lever to a single piece rather than two.

194.    Of the nine (9) versions of the Petzl Shunt, only the last two (2) versions have included this single-piece lever.

195.    Based on a 1970 patent and the fact that nine (9) versions exist, each version has averaged approximately six (6) years on the market; curiously, the Malaysian factory opened fourteen (14) years ago.

196.    Yet, despite appearances - that Defendant altered the design of the Shunt lever in order to save money by manufacturing of the component in Malaysia, the Shunt's packaging, and the literature continue to state that the product is made in France.

197.    The false designation that the product is made in France rather than in Malaysia has the capacity to attract, and deceive, customers who purchase goods based on an understanding of quality and safety in European manufacturing.

198.    Moreover, given the size of the subject factory, this is not the only Petzl product falsely designated as made in France.

199.    Plaintiff is entitled to recover from Defendants their profits, damages, triple damages, attorney fees, and costs pursuant to 15 U.S.C. § 1117 as an exceptional case and under CCPA.

## THIRD CLAIM FOR RELIEF
### (Civil Conspiracy)

200.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

201.    Defendant Petzl Distribution holds the patent to the Petzl Shunt.

202.    The Shunt is at least partially produced at the Petzl Malaysia manufacturing plant, and Petzl Distribution and Petzl America, Inc. distribute the Shunt worldwide.

203.    Big Bang, the holder of the Petzl trademark, supervises this operation and Licenses production to ensure that the Petzl brand and reputation remains robust.

204.    Each of these Defendants (collectively "Petzl" hereafter) worked together to unlawfully misrepresent the safety, quality, and origin of the Shunt so that they could continue to benefit from sales of the dangerous device.

205.    Through false advertising and failing to warn customers of the hazards of the Shunt, the Defendants' actions created an impression that the Shunt was safe.

206.    The Plaintiff relied on that impression when, after researching which device would be best for top-rope soloing, he purchased the Shunt in the State of Colorado.

207.    If not for the Defendant's misrepresentations on the safety, quality, and origin of the Shunt, the Plaintiff would not have purchased it, and he would not have suffered injuries when his rope detached from the device.

208.    The Plaintiff's resulting damages include, but are not limited to, physical, mental, and emotional suffering, medical expenses, loss of enjoyment of life, and loss of earning capability.

**FOURTH CLAIM FOR RELIEF**
**(Violation of Colorado Organized Crime Control Act)**
**C.R.S. § 18-17-101, *et. seq.***

209.   Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

210.   As advised by Defendant Petzl America, Inc. in response to this suit, the French Patent holder, the European Distributor, and the Malaysian manufacturer, and it – the American Representative of Petzl, are all separate legal entities.

211.   As advised by Defendant Petzl America, Inc. in response to this suit, each of these separate legal entities performed a separate and distinct function of the enterprise and for their own, individual, economic gain, in the areas of Licensing, Manufacturing, and Distribution of Petzl products including, but not limited to, the Shunt.

212.   Since at least the Lyon report in 2001, the Defendants have known that the Petzl Shunt is a dangerous device, and they even advised against its use for industrial climbers.

213.   Despite that knowledge, the Defendants worked together as an enterprise to sell and distribute the Shunt to recreational climbers throughout the world.

214.   The Defendants' efforts made the Shunt into a global best-selling piece of rock-climbing equipment despite its safety risks.

215.   Further, the Defendants allowed Petzl Experts and social media influencers to provide unofficial marketing for Petzl that continued to falsely represent the Shunt's supposed safety and quality.

216.   The Defendants, however, knew that these representations were false.

217.    In fact, each of the Defendants worked together to perpetuate the notion that Petzl products are made in France – pursuant to EU Standards, with full knowledge that approximately fourteen (14) years ago, manufacturing was moved to Malaysia.

218.    The efforts of the Defendants' enterprise led directly to the delivery of Shunts to the State of Colorado, including the one that the Plaintiff used when he nearly fell to his death.

### FIFTH CLAIM FOR RELIEF
**(Strict Product Liability)**

219.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

220.    Petzl is and at all pertinent times was the manufacturer and seller of the Petzl Shunt as defined by C.R.S. §§ 13-21-401, *et seq*.

221.    Petzl was engaged in the business of manufacturing and selling of the subject Petzl Shunt in interstate commerce, in Colorado, and around the world.

222.    The Petzl Shunt was defective and unreasonably dangerous to persons such as the Plaintiff who may reasonably be expected to be affected by the Petzl Shunt because a safety rope can detach from the Shunt, which is intended as a fall prevention safety device, under reasonably anticipated use.

223.    The Petzl Shunt was expected to reach the users without substantial change in the condition in which it was sold.

224.    Plaintiff was a person who could reasonably be expected to use and be affected by the subject Petzl Shunt.

225.    The defective condition of the Petzl Shunt was a cause of the injuries, damages, and losses sustained by the Plaintiff in amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF
### (Failure to Reasonably Warn)

226.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

227.    Defendant had a duty to warn Plaintiff and foreseeable, and expected users of the Petzl Shunt, of the serious injuries that could be sustained through the common use of the Shunt resultant from the safety rope detaching from the device under reasonably foreseeable use.

228.    Petzl knew, or in the exercise or reasonable care should have known, about the risk of serious bodily injury and death, including permanently disabling and life-threatening injuries that could arise through the common, known, expected, and foreseeable use of its Shunt for rope solo activities.

229.    Petzl failed to provide warnings or instructions that a manufacturer and seller exercising reasonable care would have provided concerning the risk, or potential risk, of serious injury that could arise through the common, known, and foreseeable use of the Shunt.

230.    A manufacturer and seller exercising reasonable care would have updated its warnings based on reports of injuries and the plethora of information showing that their product was being used in a manner that could result in serious injury and which was foreseeable or actually known to Petzl.

231.    The warnings that were given by Petzl failed to reasonably warn known, foreseeable, and expected users and climbers of the known risks associated with the use of the Petzl Shunt in its commonly used, known, and anticipated method.

232.    Petzl has a continuing duty, which has been breached, to warn Plaintiff and others using their products of the dangers associated with the common and foreseeable and expected use of their products.

233.    The Plaintiff's injuries were the direct and proximate result of Petzl's failure to warn of the dangers of using the Petzl Shunt in the commonly and foreseeably used method.

234.    Petzl's failures to reasonably warn are material insofar as Plaintiff would have never rationally used the Petzl Shunt had Defendant issued reasonable and timely warnings that the safety rope could detach from the Shunt under relatively small loads and that a stopper knot could also cause the Shunt to open and release the safety rope.

235.    The Petzl Shunt lacked sufficient warnings of the potential risks associated with the foreseeable or known use of the product.

236.    Petzl knew the risks directly associated with the design defects and ignored them. Moreover, Petzl provided incomplete and deceptive warnings about the product which were largely inconsequential given the risk of death and serious bodily harm from the use of the product which Petzl knew and could reasonably foresee.

237.    Petzl failed to reasonably warn Plaintiff for its own profit.

238.    Petzl's failure to reasonably warn Plaintiff of the risks associated with using the Shunt for its known or foreseeable use is the cause of the injuries, damages, and losses sustained by the Plaintiff, in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### (Negligence)

239.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

240.    Petzl designed, manufactured, marketed, distributed, and sold the Petzl Shunt in Colorado, the United States in interstate commerce, and around the world.

241.    Petzl was negligent by failing to exercise reasonable care to prevent the Petzl Shunt from creating an unreasonable risk of harm to recreational or sport climbers, such as Trevor Stuart, who might reasonably be expected to use the Petzl Shunt while it was being used in the manner the Defendant may have reasonably expected.

242.    Trevor Stuart is one of those people the Defendant should reasonably have expected to use the Petzl Shunt.

243.    Defendant also had a duty to consumers, such as the Plaintiff, to sell products which are safe for their intended, foreseeable, and expected use, and to ensure that they were reasonably warned about known risks associated from foreseeable or known use of the Petzl Shunt.

244.    Petzl breached its duty by selling the Petzl Shunt because it is unsafe when used for its intended or foreseeable use and when it failed to provide a reasonable warning to Plaintiff, and others similarly situated, of the known risks associated with the rope separating from the Shunt under relatively light loads, and that it can cause death or serious bodily injuries when used in the manner it was, and is, commonly and foreseeably used within the rock climbing community.

245.    Petzl also failed to recall the Shunt after it knew or should have known that the Petzl Shunt was being used extensively for top rope soloing and profiting from use by climbers, such as Plaintiff, which has caused at least one other climber to suffer life threatening injuries, and likely many others.

246.    Petzl breached its duties when it failed to recall the Petzl Shunt and when it failed to place a prominent warning on the packaging that the product's use during top rope soloing could

result in the rope easily detaching from the Shunt during a fall and cause death or serious bodily injury under relatively light loads.

247.    As a direct result of Petzl's negligence, Plaintiff sustained physical injuries and damages in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

248.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

249.    Defendant, as a part of its business, sold the Petzl Shunt in Colorado, interstate commerce, and around the world.

250.    As a part of its business, Petzl had a duty to communicate truthful, accurate, and complete safety information to foreseeable and intended users of its Shunt, such as Plaintiff.

251.    Petzl breached its duties when it negligently provided incomplete and inaccurate material information about the use of its Petzl Shunt to Plaintiff and when Petzl misrepresented the safety, use, and risks associated with its Shunt.

252.    This incomplete and inaccurate information created an untrue or mistaken impression in the mind of Plaintiff about the origin, character, quality, and safety of the Petzl Shunt, all of which would be important to a purchaser or user of the Shunt in determining his or her course of action.

253.    Defendant also misrepresented the Shunt by failing to disclose that a climber's safety rope, such as the one used and purchased by Plaintiff, could easily detach from the Shunt under relatively light loads and that the Shunt could open and release the safety rope upon impact with a stopper knot.

254.    Plaintiff is a person who would reasonably be expected to use the Petzl Shunt.

255.    Plaintiff, and the climbing public, reasonably relied upon these, and other representations made by Petzl, and its agents, and product endorsers, who also reasonably relied on Petzl's misrepresentations, which caused Plaintiff's injuries and damages in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF
### (Fraudulent Concealment)

256.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

257.    Petzl concealed material facts which it knew relating to the origin and use of the Petzl Shunt and the associated risk of the safety rope detaching or separating from the Shunt under relatively light loads or upon impact with a stopper knot which should in equity or good faith be disclosed.

258.    Petzl has actual knowledge that these facts are being concealed.

259.    At the time of his injuries, Plaintiff was ignorant of these facts being concealed by Petzl.

260.    Petzl intended the concealment to be acted upon by consumers, such as Plaintiff, engaged in a known use of the Petzl Shunt.

261.    Petzl's fraudulent concealment caused Plaintiff to sustain damages in an amount to be proven at trial.

## TENTH CLAIM FOR RELIEF
### (Breach of Implied Warranty)

262.    Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

42

263. Defendant sold the Petzl Shunt.

264. Trevor Stuart is a person who was reasonably expected to use or be affected by the Shunt.

265. The Defendant was a merchant with respect to the type of product involved.

266. The Petzl Shunt was not of merchantable quality at the time of sale for its known, expected, or foreseeable use.

267. For example, at the time Petzl marketed, distributed, and sold its Shunt to Plaintiff, Defendant warranted that it was merchantable and fit for the ordinary and foreseeable purposes for which it was intended, specifically as a fall arrestor.

268. Members of the consuming public, including consumers such as Plaintiff, were intended beneficiaries of the warranty.

269. The Petzl Shunt was not merchantable and fit for its ordinary and foreseeable purpose because it has a propensity to allow the safety rope to detach from the Shunt, itself a fall prevention device, under relatively light loads, and upon impact with a common stopper knot, which led to the serious personal injuries described herein.

270. Plaintiff reasonably relied on Defendant's representations that the Shunt was safe and free of defects and was otherwise a safe means of reducing the risk of fall, death, and serious bodily injury while using a safety rope and climbing.

271. Petzl's breach of the implied warranty of merchantability and fitness was the direct and proximate cause of Plaintiff's injuries and damages in an amount to be proven at trial.

### TWELFTH CLAIM FOR RELIEF
### (Breach of Express Warranty)

272.     Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

273.     Defendant sold the Petzl Shunt in Colorado.

274.     Petzl expressly warranted the Petzl Shunt to be guaranteed on its packaging for 3-years.

275.     The Petzl Shunt was designed as a fall arrestor.

276.     Trevor Stuart is a person who was reasonably expected to use or be affected by the Shunt.

277.     The Petzl Shunt was not as warranted, it is not safe for use as a fall arrestor.

278.     Within a reasonable time after the Plaintiff discovered or should have discovered the alleged breach of warranty, the Defendant was notified of such breach.

279.     The Defendant's breach of warranty caused the Plaintiff to sustain injuries, damages, and losses as alleged herein and as will be proven at trial.

### THIRTEENTH CLAIM FOR RELIEF
### (Unfair or Deceptive Trade Practice - CCPA)

280.     Plaintiff incorporates by reference all paragraphs as if fully set forth herein.

281.     Petzl used unfair methods of competition or deceptive acts or practices that were prohibited by law.

282.     Petzl violated consumer protection laws through its use of false and misleading misrepresentations or omissions of material fact relating to the origin, safety, and use of the Petzl Shunt.

283.     Petzl communicated the purported benefits and uses of the Shunt while failing to disclose the serious and dangerous deficiencies with its design and/or design changes made when switching manufacturing to Malaysia, specifically as it relates to the detachment of the safety rope from the Shunt for a variety of reasons and under relatively light loads, to consumers, the climbing industry, social media influencers, and climbing publications.

284.     Petzl made these representations to such people, including Plaintiff, in the marketing and advertising described herein.

285.     Petzl's conduct in connection with the Shunt was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendant misleadingly, falsely, and or deceptively misrepresented and omitted numerous material facts regarding, among other things, the origin, utility, benefits, safety, and advantages of the Petzl Shunt.

286.     Petzl falsely and recklessly, expressly, and impliedly, represented that its Petzl Shunt was made in France – thus according to EU standards, and that it could be safely used for the known and intended purpose of the device, which is fall protection from death or serious bodily harm to foreseeable users of the device, such as Trevor Stuart.

287.     Petzl publicly and widely disseminated print media, electronic media, and made other representations through product endorsers and social media influencers to prospective and actual consumers of its products, as well as to the general public, misrepresented the origin, quality, standard, and grade of its products that Petzl knew was dangerous and unsafe for the Shunt's intended, known, and foreseeable use.

288.    Petzl also advertises the Petzl Shunt for a use separate and apart from the use that it knows or should know consumers such as Plaintiff actually use the Shunt for, specifically top rope soloing, self-belay, self-lining, and as an ascender.

289.    These misrepresentations were made expressly as a deceptive lure and inducement to members of the public, including Plaintiff, to enter a business transaction with Petzl to induce members of the public and Plaintiff to purchase and use Petzl's products, including the Petzl Shunt.

290.    The deceptive trade practices perpetrated by Petzl during times relevant to this First Amended Complaint directly involved the general public and significantly impacted the public as actual or potential customers of Petzl's products, including the Plaintiff, numerous other customers within Colorado, the United States and around the world as consumers of Petzl's products, including the Petzl Shunt.

291.    Petzl failed to disclose known deficiencies in safety to actual and potential customers of its products, including the Petzl Shunt, to Plaintiff and the climbing community within Colorado.

292.    Petzl's negligent or false representations or concealment made through their agents and/or employees, including but not limited to, the representations described herein, constitute deceptive trade practices as defined by state law, including C.R.S. § 6-1-105 (e) and (g), which the latter subsection provision permits this deceptive trade practice claim for all actual damages sustained and for treble damages under § 6-1-113 against a defendant who in the course of a business, vocation and occupation represents that goods, foods, services, or property are of a particular origin, standard quality or grade, or that goods are of a particular style of model, if he know or should know that they are of another.

293.    Petzl acquired substantial money as a result of engaging in the above-described deceptive trade practices from Plaintiff and other customers of its product(s).

294.    As a result of these violations of consumer protection laws, Plaintiff has incurred, and will incur; serious physical injury (including in some cases death), pain, suffering, loss of income, loss of opportunity, loss of family and social relationships, and medical, hospital and surgical expenses, and other expense related to the diagnosis and treatment thereof, for which Petzl is liable.

295.    As a direct and proximate result of Petzl's deceptive trade practices, Plaintiff has incurred expenses and damages which will be proven at trial.

296.    Pursuant to statute, Plaintiff is entitled to all actual damages and attorney's fees under the CCPA.

297.    Pursuant to statute, Plaintiff is entitled to an amount equal to three times the amount of actual damages sustained to redress Petzl's bad faith conduct as defined by state consumer protection laws to include fraudulent, willful, knowing, or intentional conduct that caused injury.

## JURY DEMAND

*Plaintiff demands a jury trial on all claims and defenses so triable*.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, Trevor Stuart, respectfully requests that the Court enter judgment in his favor, for actual and compensatory damages, including damages for permanent impairment, scarring, pain and suffering, mental and emotional suffering, past and future medical expenses, loss of enjoyment of life and earnings and earning capability, Defendants' profits, for attorney fees and costs pursuant to statute and law, treble damages pursuant to statute and law,

together with pre-judgment and post-judgment interest, and for such other relief as the Court deems

just and proper.

Dated:  April 10, 2023.

                                                      Respectfully submitted,

                                                      M<sup>c</sup>Leod | Brunger PLLC

*By:* */s/Joseph A. O' Keefe*
                   Scott D. M<sup>c</sup>Leod, Esq.
                   Joseph A. O'Keefe, Esq.
                   10374 Park Meadows Drive, St. 260
                   Lone Tree, CO 80124
                   (720) 443-6600
                   smcleod@mcleodbrunger.com
                   jokeefe@mcleodbrunger.com